UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

......................................................................................x

THERESE GARAFALO

Docket No:

**COMPLAINT**

Plaintiff,

-against-                                                                   **JURY DEMAND**

THE CITY OF NEW YORK, DEPUTY INSPECTOR PETER
ROSE, Individually,  and DEPUTY INSPECTOR WILLIAM
GLYNN, Individually

Defendants.

......................................................................................x

The plaintiff, THERESE GARAFALO  (hereinafter "Plaintiff") by her attorneys THE LAW

OFFICE OF JOHN A. SCOLA, PLLC., allege the following upon information and belief, against THE

CITY OF NEW YORK; DEPUTY INSPECTOR PETE ROSE, Individually and DEPUTY

INSPECTOR WILLIAM GLYNN, Individually, as follows:

### NATURE OF THE ACTION

1.  This is an action for compensatory, emotional and punitive damages to redress the past and

    future deprivation of rights secured to Plaintiff by Title VII of the Civil Rights Act of 1964

    ("Title VII"), as amended, 42 U.S.C. §§ 2000e, et seq.,, 42 U.S.C. §§ 1985 and 1986, the New

    York States Human Rights Law, New York Executive Law §§290 et seq.; New York City Local

    Law 59 of 1986,  New York City Human Rights Law 8-107.

### JURISDICTION AND VENUE

2.  The jurisdiction of this Court is invoked pursuant to 42 U.S.C. §2000e-5(f)(3), 28 U.S.C. §§

    1331 and 1343 (3), and 28 U.S.C. § 1367(a) for claims arising under the New York State Human

    Rights Law and the New York City Human Rights Law based on the doctrine of supplemental

1

jurisdiction in that such claims arise from a common nucleus of operative fact, and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction appropriate.

3. Venue is properly placed in the Eastern District of New York under 28 U.S.C.§1391(b) and 42 U.S.C. 2000e-5(f)(3) as a substantial part of the events giving rise to this claim arose in this district and records relevant to the practices complained of herein are located in this district.

4. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII. Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") (Charge #: 520-2020-01819) was filed on January 8, 2020 and a right to sue letter was received by Plaintiff on September 15, 2020.

5. This lawsuit is commenced within ninety (90) days of the receipt by Plaintiff of his notice of right to sue from the EEOC.

**PARTIES**

6. Plaintiff Therese Garafalo is a female retired sergeant from the New York City Police Department who retired from on April 30, 2019 after twenty seven years of service.

7. Defendant City of New York ("NYC" or "City") is and was at all times relevant hereto a municipal corporation duly organized and existing under the laws of the State of New York exercising governmental authority, Defendant is an employer as defined by Title VII and is an employer subject to the New York State Human Rights Law and New York City Local Law , Defendant City of New York is a "person" for purposes of§§ 1981, 1983, 1985 and the Fourteenth Amendment of the U.S. Constitution. Defendant City of New York was or is the employer of Plaintiff and other named Defendants herein.

8. Defendant PETER ROSE, is and was an employee of the New York City Police Department and thus the CITY OF NEW YORK.

9. Defendant WILLIAM GLYNN is and was an employee of the New York City Police Department and thus the CITY OF NEW YORK.

## ALLEGATIONS OF FACT

10. Plaintiff joined the NYPD on January 13, 1992.

11. After working as a police officer for approximately ten (10) years Plaintiff was promoted to Sergeant on May 30, 2002.

12. In February 2, 2010, Plaintiff was transferred to the 94th Precinct where she started experiencing disparate treatment within the NYPD as a result of her gender.

13. Shortly after joining the 94th Precinct it became apparent that Plaintiff's male counterparts would be given more overtime, preferred assignments and specialized details than Plaintiff despite having the exact same qualifications and more seniority.

14. Specialized units within the NYPD are sought after by members of service because they allow said members to earn substantial overtime and advancement.

15. While Plaintiff applied and was highly recommended by Deputy Inspector Hurson for the vacant position, Plaintiff never received an interview or a phone call.

16. Rather the position was given to Sergeant Gonzalez (male). Sergeant Gonzalez was given the position through a connection and who had stated he did not have to fill out an application. Sergeant Gonzalez retired a year later.

17. Following Sergeant Gonzalez's retirement, Plaintiff was again passed over for the position. This time the position was given to Sergeant Caraballo (male).

18. Plaintiff again was not contacted nor interviewed for the position and the opportunity was again given to a male counterpart through the same connection who did not have to apply for the position.

19. On August 14, 2012 Plaintiff received a memorandum from Deputy Chief Brian McCarthy on behalf of Chief Hall commending her on her excellent job performance.

20. As a result, Plaintiff submitted paperwork for an accommodation for two (2) incidents dated August 9, 2012 and October 22, 2012, one of which became newsworthy. The paperwork disappeared from the Administration Office resulting in Plaintiff being denied this accommodation.

21. Upon information and belief, Plaintiff was a woman who was outperforming many of my male coworkers.

22. From 2013 through 2015 Plaintiff was repeatedly evaluated lower than her male counterparts.

23. During this time, Plaintiff was assigned to Traffic Safety/Training Sergeant position which was double the workload than her male counterparts.

24. In Plaintiff's evaluation for 2013 Captain Komar noted that Plaintiff had an increased workload but still lowered her evaluation rating.

25. This resulted in a lower than average score compared to Plaintiff's previous evaluations which were well above average.

26. Captain Komar could not find a supervisor to work the Traffic Safety/Training Sergeant position which he supervised. Plaintiff stated she would only take position if Plaintiff remained with 3rd Platoon chart and that he made sure Plaintiff receive her share of overtime.

27. Captain Komar assured Plaintiff that her tour would remain the same and that Plaintiff would be given overtime.

28. Despite this promise he failed to follow through on either promise. Within weeks Captain Komar changed Plaintiff's chart and forced her to modified day tours.

29. Further, overtime remained unchanged with the vast majority going to male Sergeants who had less seniority than Plaintiff.

30. Captain Komar would repeatedly state that Plaintiff was "still learning" and suggested

that Plaintiff was a woman in need of constant male supervision.

31. Plaintiff found these insinuations discriminatory.

32. Plaintiff appealed her 3.5 evaluation which was thwarted by the Operations Coordinator Lieutenant.

33. An evaluation of 3.5 or less will not allow you to apply for a specialized detail and was given purposefully to Plaintiff to ensure that her upward mobility in the Department was limited.

34. Plaintiff's male sergeant colleagues would receive above average performance evaluations.

35. On July 22, 2014 Captain Komar stated that Plaintiff was "too much of a perfectionist" (which Plaintiff documented in her memo book) because Plaintiff dedicated too much time to correcting problems and training officers on how they could better improve and correct their performance.

36. Captain Komar would always hover over Plaintiff in a very close manner which made me uncomfortable.

37. Plaintiff was worried about complaining to a male supervisor about this as Plaintiff didn't want to be labeled as a problem within the command.

38. Plaintiff was treated so poorly by Captain Komar that when her aunt was dying from cancer in October 2013, he made her sit through a Traffic Stat meeting before he let her visit her aunt on her death bed.

39. After Plaintiff arrived in Wisconsin and her aunt's death was imminent, Captain Komar told Plaintiff to hurry back which made her worry constantly about my job while Plaintiff was supposed to be caring for her aunt.

40. By contrast when a new rookie male sergeant was assigned Plaintiff's position as Traffic Safety supervisor he was immediately granted the summer off for family reasons without

incident.

41. After Plaintiff left the dual position, the assignments were split back into two (2) with a different supervisor responsible for each position.

42. On July 18, 2015, a week prior to Captain Rose arriving to the 94th Precinct, Plaintiff had issued serious command disciplines to Police Officer Haro (female) and Police Officer Khan (male) for malingering in the station house, not in the Interrupted Log, failing to notify Central Radio when they were 10-98 from a prisoner transport and failing to answer jobs in their sector. In addition, Officer Haro was written up for being in civilian attire and out of uniform prior to her end of tour.

43. The disparate treatment became even more obvious when Captain Peter Rose took over command of the 94th Precinct on July 25, 2015.

44. Captain Rose, a known lady's man, began treating Plaintiff differently than other male supervisors in her command.

45. Officer Haro openly admitted that she had numerous sexual relations with a married sergeant in her previous command, a married officer, a single officer and two (2) more married sergeants in the 94th Precinct.

46. Captain Rose had an inappropriate relationship with Police Officer Haro.

47. Officer Haro was labeled as "untouchable" and male supervisors looked the other way at her wrong doings.

48. Officer Haro was observed on a regular basis in his office on unofficial business and it was known that he communicated with her throughout the workday on a personal level by text message and cellphone. It was rumored that he had a past sexual relationship with the officer.

49. Captain Rose intervened and made the command disciplines against the officers Haro disappear because it involved Police Officer Haro.

50. Following this incident, Police Officer Haro had boasted to other female officers that he was going to make it disappear.

51. Plaintiff continued to be treated in a disparate manner from this point over by Captain Rose and the other supervisors in the Command.

52. Captain Rose never spoke to Plaintiff about these command disciplines and despite these serious violations, the police officers were never disciplined.

53. Plaintiff was one of the few women supervisors in the 94th Precinct.

54. In fact, Plaintiff had the most seniority in her rank of anyone in the precinct.

55. The male supervisors were part of a "boys club" and financially benefited for being a member of that click.

56. These male supervisors were given better assignments and given significantly more overtime than Plaintiff.

57. The "boys club" in the command under the direction of Captain Rose was obvious.

58. Male sergeants were given the most lucrative positions.

59. These positions included an administrative (non-descriptive) supervisor, Training supervisor, Traffic Safety supervisor, N.C.O. (Neighborhood Coordinator Officer) supervisor and Anti-Crime supervisors. Plaintiff was never offered any of these positions despite my strong verbal interest and being more than qualified.

60. These positions are more lucrative because they allow sergeants to make significantly more overtime and provide for greater career advancement.

61. Overtime was offered to male supervisors first and Plaintiff was left to pick up the overtime table scraps whenever Plaintiff could get them.

62. Despite being highly competent in her role, Plaintiff's work was never recognized in the way that her male counterparts were, and Plaintiff lost thousands of dollars due to the disparate ways overtime and assignments were applied to supervisors.

63. As the only female supervisor at the command for over two (2) years, Plaintiff's ability to supervise properly was undermined by the male supervisors in the Command who never recognizing my work.

64. Captain Rose immediately had disdain for Plaintiff because of the command discipline Plaintiff wrote Police Officer Haro and as such Plaintiff was not able to earn as much as her male colleagues.

65. In October 2015, a female officer and Plaintiff organized and worked on the NYPD Breast Cancer Awareness Campaign and contest with the help of the precinct custodian.

66. Plaintiff asked Captain Rose for help from command funds but received none.

67. Plaintiff paid a lot out of pocket money for the campaign as it was important to her as she is a breast cancer survivor.

68. Plaintiff asked Captain Rose for help getting our pictures on Twitter since this was how they were being judged by the Police Commissioner but again received no cooperation.

69. As part of the awareness campaign, Plaintiff created a pink autumn themed display with carved and painted pumpkins to bring awareness to breast cancer.

70. Shortly before the display was finished, officer(s) carved a penis out of a pumpkin and stuck it into the mouth they carved out of another pumpkin

71. Two male officers, who were never investigated, took two of the display pumpkins and carved out sexual images and took photos of their work in front of the precinct desk and sent them out to officers via text messages.

72. Plaintiff was informed of the pumpkin carving incident and had to report it as an Equal Employment Opportunity Office as mandated per the Patrol Guide procedure for supervisors.

73. Captain Rose did damage control to cover up the incident and the officers involved were never investigated.

74. Instead, Plaintiff was retaliated against.

75. Plaintiff was repeatedly harassed and made fun of over the Halloween display.

76. Plaintiff's work was disregarded simply due to her gender.

77. Plaintiff was fed up and had enough of the stressful and discriminatory work environment she was subjected. This included being transferred from the 4 x 12 tour which cost Plaintiff thousands of dollars in lost night differential and resulting increased travel time simply to make way for Sergeant Lucas, a black male with less seniority, who had just joined the Command after being transferred for "cause" for disciplinary reasons.

78. Lucas was given this position after claiming hardship while the hardship Plaintiff was subjected to as a result of the tour change was ignored.

79. Plaintiff was distraught and felt suicidal due to the constant harassment, retaliation and unfair treatment.

80. The harassment became so severe that on this occasion Plaintiff took her firearm and shield and handed them to the Desk Officer and walked out of the Command.

81. Five (5) male supervisors were at the desk, some laughing at Plaintiff so she got in her car and left.

82. Not one supervisor followed me to see if Plaintiff was O.K. during a time when the NYPD had started a campaign "Are You OK?" related to increased stress and suicide of officer.

83. Plaintiff then spoke with a sergeant by phone who had been ordered by Captain Rose to improperly fill out her retirement papers.

84. Plaintiff spoke with Captain Rose who screamed and yelled at her on the phone.

85. Plaintiff called and spoke with the Department Chaplain and asked for his help.

86. The Chaplain called Captain Rose to ask him to stop treating me the way that he was.

87. Following the conversation with the Chaplain, Plaintiff was told to report to work the next morning on my R.D.O. (regular day off) and that he would help me.

88. Plaintiff was then given my gun and shield that day with no discipline.

89. Plaintiff was told to submit an overtime slip.

90. Following this incident, Plaintiff submitted an overtime slip for 10:20 hours of overtime twice but waited two months for payment thinking the slips were lost.

91. It was then Plaintiff realized that Captain Rose made her overtime slips disappear and that Plaintiff was not going to be paid. .

92. During this time there was such disdain for Plaintiff and her female coworker's hard work that some of the other decorations were damaged and destroyed and her department mailbox behind the desk was ruffled through.

93. Plaintiff had left her police radio in her mailbox that was secured by a desk supervisor and it was intentionally taken by an officer who was never investigated.

94. The officer involved was male Police Officer Inglesias.

95. Instead, Plaintiff received a command discipline for failing to secure her department property and it was reported as lost even though Plaintiff didn't lose it.

96. The radio was returned and placed behind desk the next day.

97. Police Officer Inglesias was later transferred to a Detail assignment and it was learned that he lost his department radio and was never disciplined.

98. Captain Rose improperly allowed Police Benevolent Association Delegate and Community Affairs Officer, Steve Trugglio, control Detail assignments and overtime within the precinct.

99. Plaintiff was not assigned overtime in a way that my male counterparts were despite repeatedly asking for these assignments and being the senior member within her rank.

100. An example of this occurred on May 24, 2016 when there was six (6) overtime tours offered to sergeants. Plaintiff received none of them.

101. Meanwhile Sergeant Cooper, a male, received three (3) tours.

102. Cash Overtime was usually capped at thirty (30) hours per month.

103. Plaintiff's fellow supervisors who were members of the "boys club" would cap out their overtime easily without having to ask for the additional hours.

104. Some male sergeants were allowed to exceed this cap without discipline contrary to the rules of the command.

105. Meanwhile, Plaintiff would have to beg for overtime and was only given unwanted assignments and whatever was left over only after the male sergeants didn't want it or were unable (due to schedule conflict) to do the overtime.

106. Plaintiff was given nowhere near as much cash overtime as the thirty (30) hour cap that her male counterparts would regularly achieve.

107. Male Sergeants Ernesto Nieves, Jerome Magluilo, Jorge Caraballo, Igor Ubavin and Francis Cooper were among the people that were given specialized details and/or significantly more overtime than Plaintiff.

108. Specifically, Captain Rose showed special treatment to Sergeant Ubavin by allowing him to supervise Police Officer Haro knowing they were having an on-going affair and causing an unprofessional animus atmosphere in which Plaintiff found difficult and uncomfortable to work in as a woman.

109. Because of the lack of overtime, Plaintiff had to apply for the U.S. Open Detail in 2015 and asked Captain Rose to sign her application which he did.

110. Plaintiff later learned when Plaintiff was transferred to the temporary detail, he had called Patrol Borough Brooklyn North asking who had signed my application, and letting it be known that he was annoyed, suggesting that he never signed it.

111. Again, the following year on May 20, 2016, Plaintiff applied for the U.S. Open Detail.

112. This was a detail which allowed sergeants to earn over $4,500 in additional

overtime if they were assigned.

113. Plaintiff was recommended for the position by Chief Silks who Plaintiff had a good working relationship, but because of chain-of-command he needed Captain Rose to sign her application.

114. Despite this recommendation from Chief Silks, Captain Rose refused to sign it and denied my application.

115. Instead Captain Rose willingly signed two (2) male police officers applications.

116. As a result of my objections into overtime assignments Plaintiff was singled out and punished with bogus command disciplines in a way that my male counterparts were not.

117. Plaintiff was given these trumped up charges despite having proven on a regular basis that Plaintiff was reliable with strong working ethics and good integrity.

118. In December 2016, Captain Rose was involved in an incident where he stated that "rapes are not real rapes" at a community meeting about sexual assault victims.

119. This resulted in months of newspaper and television coverage and a protest in front of the 94 Precinct.

120. In February 2017, there were rumors flying around that someone had written a letter to the Internal Affairs Bureau about Captain Rose due to his improprieties and comments.

121. It was spread around the command that Plaintiff was the one who wrote the letter despite that not being the case.

122. As a result of this misperception by Captain Rose Plaintiff was further retaliated against.

123. Plaintiff was issued several Command discipline's which were never properly adjudicated. and some of the command disciplines were never even brought to her attention.

124. Unaware that she was even being disciplined, Plaintiff was not given the opportunity to properly defend herself.

125. On February 20, 2017, while assigned Desk duties, Plaintiff was issued a command discipline by Lieutenant Hong on orders from Captain Rose for failure to inspect and voucher a firearm and non-firearm items which was rejected and returned to the command.

126. Despite being given this discipline there are no Patrol Guide procedures to follow but were subject to the rules of the Property Clerk.

127. Plaintiff was unaware of this as she was recently transferred to the midnight tour.

128. Sergeant Hicks stated that he would fix the problem, take responsibility for correction and then forward the property.

129. Captain Rose claimed that due to the process being delayed, we were given Command disciplines.

130. Plaintiff was not shown the command discipline until December 12, 2018.

131. On April 24, 2017 Plaintiff was targeted and issued a command discipline ordered by Captain Rose accusing me of failing to relieve an officer in a timely manner during a rape investigation.

132. As a result of Captain Rose's flippancy towards rape Plaintiff wanted to make sure we Plaintiff did not fail the Department on a rape investigation.

133. Plaintiff was accused of failing to relieve Police Officer Camacho after she subsequently put in for cash overtime.

134. Captain Rose claimed that Plaintiff failed to send another officer to relieve her.

135. This was contrary to Department policy.

136. The Special Victims Unit Sergeant required that the officer remain with the victim while the investigation was on-going.

137. Further, Plaintiff informed Lieutenant Hong, the 2nd Platoon Commander, when

Plaintiff was relieved from the desk at around 0700 hours that Police Officer Camacho was with the victim and l explained why.

138. It was learned the next day that Lieutenant Hong was present when Police Officer Camacho returned to the command but did not monitor her while on overtime until 1000 or 1100 hours.

139. Despite these facts, Plaintiff was threatened with a command discipline by Lieutenant Hong after she was approached by Captain Rose.

140. Even when Plaintiff explained her conscientious decision and due diligence, Plaintiff apparently was issued a command discipline.

141. Plaintiff was never allowed to present the valid reasons for her actions.

142. Again Plaintiff did not see the Command discipline until December 12, 2018.

143. Meanwhile, Plaintiff was still not being assigned overtime.

144. Two examples occurred on May 7 and 8, 2017. Sergeant Magluilo was granted overtime for the 94 Precinct 5k Run Detail (10:00 hours) when Plaintiff was available due to her regularly scheduled day off. This again happened on May 8, 2019 when Sergeant Magluilo was granted Brooklyn Bridge Detail (8:57 hours) when Plaintiff was again on her regularly scheduled day off.

145. Normally officers who have their regularly scheduled days off are given priority and fair distribution regarding overtime assignments. That was not the case for Plaintiff.

146. On May 10, 2017 Plaintiff was issued a phantom command discipline.

147. Plaintiff was targeted and issued the command discipline for incomplete command log entries although it was never presented to her and she never signed off on it.

148. In this instance Plaintiff was accused of not assigning tasers to Anti-Crime officers and not entering the information in the command log. The officers never came to the desk to retrieve their tasers because they had never turned out to patrol and as such it was the

Anti-Crime supervisor's responsibility to turn them out.  Plaintiff was blamed.

149.	Plaintiff was singled out for this in a way that my male counterparts were not.

150.	On May 31, 2017, Plaintiff was again issued a command discipline by Lieutenant Hong.

151.	In this instance, due to her incompetence as Operations Coordinator, she covered up her mistake and  accused Plaintiff of failing to attend a meeting and following orders.

152.	This bogus command discipline alleged that Plaintiff had failed to attend a Platoon Commander meeting for Lieutenants at 1400 hours requiring a start time at 1315 hours. Despite being a sergeant and her tour starting at 1450 hours.  Plaintiff was not given an official notification with a tour change ordering me to attend.

153.	Plaintiff did not learn of this command discipline until  December 12, 2018.

154.	On August 2, 2017 Plaintiff was again denied the U.S. Open Detail when Captain Rose refused to sign her application and gave no legitimate reason for the denial, costing Plaintiff substantially in overtime pay.

155.	This was deliberate retaliation.

156.	On August 29, 2018 Plaintiff was issued a command discipline for failing to assign a 311 job dated on July 230, 2017.

157.	Plaintiff was again uninformed about this command discipline until December 12, 2018.

158.	Plaintiff was accused of failing to assign officers to the 311 complaint. Plaintiff never learned of this complaint and was never able to present evidence about this chronic complainant or address the bogus accusations waged against me.

159.	Plaintiff knew nothing about this command discipline other than it was about 311 calls and that cops under her authority addressed this complainant many times under her authority .

160. Plaintiff was never able to address this matter since Plaintiff never learned of this command discipline until a year and a half later.

161. On November 1, 2018 Plaintiff received another command discipline by Lieutenant Hong but was again never informed of it on December 12, 2019.

162. Plaintiff was accused of cancelling a training session without authorization even though Plaintiff went through proper channels to do so.

163. Plaintiff was threatened and screamed and yelled at in front of my peers and subordinates. Plaintiff was accused of lying even though Plaintiff requested her to speak to the appropriate supervisor who authorized my rescheduled session to no avail.

164. In November 2018, Plaintiff applied to an internal NYPD memo for the specialized position as the Traffic Safety sergeant. Her application was never seriously considered even though Plaintiff was the most qualified and the lucrative position was offered to Sergeant Reda, a newly promoted male sergeant.

165. Although Sergeant Reda had no interest or experience in the position, he was coached by Lieutenant Hong under Captain Glynn's authority to submit an application.

166. As a result of her submitted application Plaintiff received threatening and harassing emails from Lieutenant Hong on November 4th and 8th deterring her from the position.

167. Lieutenant Hong continuously harassed Plaintiff to show the Commanding Officer she was an adequate supervisor. She expressed to me that the precinct was a "boys club." To prove herself to them she then targeted Plaintiff because she suspected Plaintiff knew of her inappropriate relationship with the precinct custodian.

168. On December 12, 2018 Plaintiff was called into Captain Glynn's office and was presented with the aforementioned command disciplines.

169. This was the first Plaintiff was hearing of any of these command disciplines, contrary to the procedures of the Department.

170. Plaintiff was then retaliated against by Captain Glynn who stated he was transferring her for disciplinary reasons despite protocol to address the problem before it worsened.

171. Issuing repeated command discipline is a common way in which officers are discriminated and retaliated against within the Department.

172. This is known as "dirtying" an officers Central Personnel Index which allows the supervisors in a command to transfer an officer they dislike and hinders said officers upward mobility within the Department.

173. After Plaintiff was told that she was being transferred Plaintiff immediately went to the Pension Section to retire as Plaintiff had enough of the internal culture of discrimination and retaliation within the NYPD.

174. After repeated efforts by her supervisors to force me out of the Department Plaintiff was worried that their actions could jeopardize her pension leaving her with no choice but to retire.

175. Plaintiff felt she had no choice but to retire or risk her pension and future emotional harm.

176. Plaintiff was constructively discharged when she submitted her retirement papers.

177. On December 12, 2018 Plaintiff went to the Pension Section to submit her papers for retirement giving the NYPD 30 days' notice.

178. Plaintiff was going to work until her retirement date, not taking terminal leave.

179. Unbeknownst to her and the Pension Section at the time Plaintiff put in her retirement papers, there was a pending investigation for an off-duty incident which occurred on November 29, 2017.

180. By putting in her retirement papers, Plaintiff was accused of trying to retire without giving a 30 day notice (taking terminal leave); a wholly unknown investigation allegation

that Plaintiff was not even aware of at the time she attempted to retire.

181. On December 13, 2018, Captain Murria Patrol Borough Brooklyn North Inspections Unit came to Plaintiff's house on her day off and improperly removed her firearms in order to stop her retirement due to a pending GO-15 (internal NYPD hearing).

182. Plaintiff was placed on modified assignment by the NYPD which resulted in having my gun and badge stripped so that Plaintiff could not retire with the "good guy" letter.

183. Plaintiff was told by Captain Murria to pull her retirement papers if Plaintiff wanted the "good guy" letter".

184. Following his advice Plaintiff immediately went to the Pension Section to pull her retirement papers.

185. As a result of her modified duty status Plaintiff was transferred to the Viper Unit and was unable to work overtime and had to travel further into Manhattan causing further hardship and greatly impacting her retirement pension.

186. Plaintiff was ordered to report to NYPD Headquarters on December 14, 2018 where Plaintiff learned Plaintiff was transferred to Manhattan Housing Bureau Viper Unit, a unit where officers are continuously retaliated against.

187. On December 20, 2018 a GO-15 was conducted. On the advice from Captain Murria, Plaintiff pulled her retirement papers as Plaintiff wanted to leave the department with my "good guy" letter.

188. This letter is necessary for a police officer to retire in good standing and be able to carry a gun post retirement. The "good guy" letter is extremely valuable as it allows retired police officers to protect themselves, their family and their community for which they have been trained and work high paying (security) jobs that require the carrying of a firearm.

189. On December 31, 2018, Plaintiff was issued a command discipline for failing to make notification in a timely manner relating to being ticketed for speeding on Long Island in November, 2017.

190. As a result of the speeding Plaintiff's driver's license was temporarily and improperly suspended but was from November 29, 2017 which was retracted on December 19, 2017.

191. Plaintiff's modification, which stemmed from this December 31, 2018 command discipline regarding the off-duty incident in 2017 forcing her out of retirement, was an abuse of power as the accusation made against her was simply **a** patrol guide violation and didn't justify modification of duty as stated within the NYPD's internal policy.

192. As a result of this modification of duty and the change to the day tour, a six thousand dollar ($6,000) annual reduction in pay caused Plaintiff to lose a significant amount of pension money that Plaintiff will continue to lose every year for the rest of her life as an officer's pension is based on their earnings leading up to their retirement.

193. On January 10, 2018, Plaintiff signed off on the command discipline before Captain Glynn for failing to report an off-duty incident in a timely manner as Plaintiff was just fed up with the discriminatory animus of the Department and was worried if she did not the Department would somehow stymie her pension.

194. Following the adjudication of this command discipline, Plaintiff was supposed to be restored to full duty. It became apparent Plaintiff was purposefully lost in the system as Plaintiff sat in limbo waiting to be restored to full duty.

195. Plaintiff repeatedly called the Department to find out why she was not being restored to full duty but received no answers.

196. On March 19, 2019, Plaintiff was restored to full duty. Plaintiff immediately put in her retirement papers as Plaintiff couldn't risk jeopardizing my pension. Plaintiff was also

19

finally allowed to retire and receive my "good guy" letter.

197. Plaintiff was then noticed that she was being placed on Performance Monitoring despite having committed no wrongdoing,

198. Plaintiff subsequently learned that the Department wrote a "49", a Department letter, that Plaintiff was to be restored to full duty on February 4, 2019 and was not.

199. Following restoration to Full Duty Plaintiff put in my retirement papers for the second time, giving the NYPD a 30 day notice.

200. Plaintiff would have continued working for the Department but for the discrimination and retaliation she suffered.

201. Out of fear that Plaintiff would lose her retirement benefits if she remained on the job, Plaintiff was forced to retire or risk jeopardizing over two decades of work with the NYPD.

202. A reasonable person would have retired if in Plaintiff's position as he risk of termination without retirement benefits was imminent.

203. A reasonable person would have determined that the working conditions and gender biases that Plaintiff was subjected to would necessitate leaving the NYPD.

204. The treatment was so bad and the risk so great that a normal person under said conditions would have left the position.

205. Plaintiff, having been forced to retire from the NYPD prematurely or risk her pension and health, was constructively discharged from the NYPD.

206. A month later Plaintiff officially retired on April 30, 2019 with her "good guy" letter.

207. The discriminatory animus was continuous from 2012 until the date Plaintiff was forced to retire.

208. During her employment with the NYPD Plaintiff have been repeatedly mistreated, falsely accused of failing to perform my job adequately, denied overtime, denied

specialized assignments and treated differently because Plaintiff am a woman.

209.     This discriminatory environment has left Plaintiff battered and emotionally scarred with no chance of advancement and my good reputation tarnished.

**COUNT I**
**DISCRIMINATION**
**IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

210.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

211.     Plaintiff alleges that Title VII of the Civil Rights Act of 1964 makes it unlawful to discriminate or retaliate against an individual on the basis of their gender in violation of 42 U.S.C. §§2000e et seq.

212.     Plaintiff suffered adverse employment actions on the basis of her gender based on the disparate application of opportunities during her employment and subsequent termination.

213.     Defendants implementation of terms and conditions of employment, including the disparate treatment and pay of Plaintiff and termination violates 42 U.S.C. §2000e-3(a) which makes it unlawful for an employer to discriminate and/or retaliate against any of its employees for opposing unlawful employment practices or filing complaints of discrimination.

214.     Plaintiff has satisfied the procedural requirements of Title VII as a condition of filling this action, in particular, Plaintiff filed a timely charge with the EEOC and filed the complaint within ninety (90) days from receipt of the notice of right to sue on which this lawsuit is based.

215.     Plaintiff has suffered and will continue to suffer irreparable injury caused by Defendants' illegal conduct including interference with her civil rights, right to speak out

against discrimination and to and to be free of such discrimination based upon her gender.

216. As a direct and proximate result of Defendants unlawful acts, Plaintiff continues to suffer loss of employment, constructive discharge, loss of income, loss of other employment benefits including, and have suffered and continue to suffer distress, humiliation, great expense, embarrassment, and damage to their reputations.

217. As a result of the forgoing, Plaintiff is entitled to compensatory damages pursuant to Title VII in an amount to be determined at trial.

**COUNT II**
**RETALIATION**
**IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

218. Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

219. Plaintiff alleges that Title VII of the Civil Rights Act of 1964 makes it unlawful to discriminate or retaliate against an individual on the basis of her gender in violation of 42 U.S.C. §§2000e et seq.

220. Defendants subjected Plaintiff to retaliation for her lawful complaints of discrimination based on her gender.

221. Plaintiff suffered adverse employment actions in retaliation for these complaints.

222. Defendants implementation of terms and conditions of employment, including the disparate disciplinary treatment of Plaintiff in retaliation for his complaints of discrimination, violates 42 U.S.C. §2000e-3(a) which makes it unlawful for an employer to discriminate and/or retaliate against any of its employees for opposing unlawful employment practices or filing complaints of discrimination.

223. Plaintiff has satisfied the procedural requirements of Title VII as a condition of filling this action, in particular, Plaintiff filed a timely charge with the EEOC and filed the

complaint within ninety (90) days from receipt of the notice of right to sue on which this lawsuit is based.

224. Plaintiff has suffered and will continue to suffer irreparable injury caused by Defendants' illegal conduct including interference with her civil rights, right to speak out against discrimination and to and to be free of such discrimination based upon her gender.

225. As a direct and proximate result of Defendants unlawful acts, Plaintiffs and has suffered and continue to suffer loss of employment, constructive discharge, loss of income, loss of other employment benefits including, and have suffered and continue to suffer distress, humiliation, great expense, embarrassment, and damage to their reputations.

226. As a result of the forgoing, Plaintiff is entitled to compensatory damages pursuant to Title VII in an amount to be determined at trial.

### COUNT III
**(42 U.S.C. §§ 1985 and 1986)**

227. Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

228. Upon information and belief, Defendants have and continue to conspire with and amongst each Plaintiff the rights, privileges and immunities, and the equal protection of the laws to which they are entitled under the Constitution and laws of the United States in violation of 42 U.S.C. §1985.

229. As a direct result of this conspiracy, the Defendants injured Plaintiff and deprived him of having and exercising their rights and privileges under the Constitution and laws of the United States.

230. The actions and omissions of Defendants described herein were willful and malicious and based upon invidious gender and class based animus. The purpose of the aforementioned conspiracy was to violate the constitutional rights of the Plaintiff and as

23

such violated 42 U.S.C. § 1985.

231. All of the individual Defendants, as public officials, had notice of the conspiracy set forth above, in violation of section 1985 and failed and refused to prevent, prohibit and ameliorate the aforementioned conspiracies notwithstanding their abilities to do so. Said failure and/or refusal to prevent, prohibit and/or ameliorate constituted a violation of 42 U.S.C . § 1986.

232. The actions of Defendants, in depriving Plaintiff of her constitutional and Civil Rights, as hereinbefore stated, were willful and malicious. As a result of Defendants' reckless and intentional acts, Plaintiff is entitled to compensatory damages and punitive damages in an amount to be determined at trial.

**COUNT IV**
**GENDER DISCRIMINATION AND HOSTILE**
**WORK ENVIRONMENT IN VIOLATION OF NYSHRL**

233. Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

234. Plaintiff alleges that New York State Executive Law §296, prohibits discrimination, harassment, and disparate treatment on the basis of gender in employment.

235. Plaintiff performed her job duties satisfactorily which is reflected in Plaintiff's stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's gender, created a hostile work environment by the conduct of Defendant CITY OF NEW YORK and without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant CITY OF NEW YORK.

236. Defendant's actions were taken under circumstances giving rise to an inference of discrimination.

237. Defendant subjected Plaintiff to a materially adverse and hostile work environment

by subjecting him to ridicule, without supervisory intervention to discrimination and retaliation based on her gender.

238.    The actions of the Defendant towards Plaintiff were severe and pervasive.

239.    The direct and proximate cause of Defendant's recklessness and negligence, Plaintiff lost her job, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, was constructively discharged, hurt her credit rating, lost career and business opportunities, suffered severe damage to her good name and reputation, and endured severe emotional pain and trauma, all to her detriment.

240.    Plaintiff alleges Defendants, engaged in various unlawful employment actions against Plaintiff based on her gender.

241.    Plaintiff alleges that as a direct and proximate result of the unlawful employment practices including a subjecting Plaintiff to a hostile work environment, of defendant CITY OF NEW YORK, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, attorneys' fees, emotional distress, and damage to her personal and professional reputation in an amount to be determined at trial.

**COUNT V**
**RETALIATION**
**IN VIOLATION OF NEW YORK**
**STATE EXECUTIVE LAW § 296**

242.    Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

243.    Plaintiff alleges that New York State Executive Law §296, makes it unlawful to deny employment and benefits therein in retaliation for Plaintiff engaging in lawfully protected activity.

244.    Plaintiff engaged in protected activity when he complained of gender discrimination.

245. Plaintiff was retaliated against by the Defendants as a result of her engagement in protected activity.

246. Defendant's actions were taken under circumstances giving rise to an inference of retaliation.

247. The direct and proximate cause of Defendants' recklessness and negligence, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt her credit rating, constructive discharge, lost career and business opportunities, suffered severe damage to her good name and reputation, and endured severe emotional pain and trauma, all to her detriment.

248. Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff in retaliation for Plaintiff's lawfully protected complaints.

249. Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, attorneys' fees, emotional distress, and damage to her personal and professional reputation in an amount to be determined at trial.

**COUNT VI**
**STRICT LIABILITY FOR GENDER**
**DISCRIMINATION AND HOSILE WORK ENVIRONMENT**
**IN VIOLATION OF NYCHRL § 8-107 (13) (b)**

250. Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

251. Plaintiff alleges that New York City Administrative Code § 8-107 (13) (b), makes a Defendant strictly liable for the acts of managers and supervisors against a subordinate employee, such as the Plaintiff herein.

252. Plaintiff was subjected to repeated gender discrimination as a result of Plaintiff's gender.

253. The Defendant was aware of the actions of managers and supervisors but failed to take corrective remedial action which forced Plaintiff to be subjected to future gender discrimination.

254. The Defendant failed to exercise reasonable diligence to prevent such gender discriminatory conduct.

255. Plaintiff performed her job duties satisfactorily which is reflected in Plaintiff's stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's gender, created a hostile work environment by the conduct of the Defendants herein without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendants.

256. Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

257. The direct and proximate cause of Defendant's recklessness and negligence, Plaintiff lost her job, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, constructive discharge, hurt her credit rating, lost career and business opportunities, suffered severe damage to her good name and reputation, and endured severe emotional pain and trauma, all to her detriment.

258. Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff based on Plaintiff's gender.

259. Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to her personal and professional reputation in an amount to be determined at trial.

260. As a result of Defendants' willful actions they are strictly liable to Plaintiff for their

actions.

**COUNT VII**
**RETALIATION**
**STRICT LIABILITY IN VIOLATION OF**
**NEW YORK CITY ADMINISTRATIVE CODE § 8-107(13)(b)**

261.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

262.     Plaintiff alleges that New York City Administrative Code § 8-107 (13) (b), makes a Defendant strictly liable for the acts of managers and supervisors against a subordinate employee, such as the Plaintiff herein.

263.     Plaintiff was subjected to repeated retaliatory acts following the lawful complaints made by Plaintiff regarding gender discrimination.

264.     The Defendants were aware of the actions of managers and supervisors but failed to take corrective remedial action which forced Plaintiff to be subjected to future retaliation.

265.     The Defendant failed to exercise reasonable diligence to prevent such retaliatory conduct.

266.     Plaintiff performed her job duties satisfactorily which is reflected in Plaintiff's stellar performance evaluations. Nevertheless, Defendants denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's gender, created a hostile work environment by the conduct of Defendants without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendants.

267.     Defendant's actions were taken under circumstances giving rise to an inference of retaliation.

268.     The direct and proximate cause of Defendants' recklessness and negligence,

28

Plaintiff lost her job, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt her credit rating, lost career and business opportunities, suffered severe damage to her good name and reputation, and endured severe emotional pain and trauma, all to her detriment.

269. Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff in retaliation for her lawfully protected complaints of gender discrimination.

270. Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to her personal and professional reputation in an amount to be determined at trial.

271. As a result of Defendant's willful actions they are strictly liable to Plaintiff for their actions.

**COUNT VIII**
**GENDER DISCRIMINATION AND**
**HOSTILE WORK ENVIRONMENT IN VIOLATION OF NYCHRL**

272. Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

273. Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment on the basis of her gender.

274. Plaintiff performed her job duties satisfactorily which is reflected in Plaintiffs stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's gender, created a hostile work environment by the conduct of Defendants. The wrongful conduct was condoned by the Defendants.

275. Defendant's actions were taken under circumstances giving rise to an inference of

discrimination.

276. The direct and proximate cause of Defendant's recklessness and negligence, Plaintiff lost her job, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, constructive discharge, hurt her credit rating, lost career and business opportunities, suffered severe damage to her good name and reputation, and endured severe emotional pain and trauma, all to her detriment.

277. Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff based on her gender.

278. Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to her personal and professional reputation in an amount to be determined at trial.

**COUNT IX**
**RETALIATION**
**IN VIOLATION OF NEW YORK CITY**
**ADMINISTRATIVE CODE § 8-107**

279. Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

280. Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment in retaliation for Plaintiff engaging in protected activity.

281. Plaintiff engaged in protected activity when she complained of gender discrimination.

282. Plaintiff was retaliated against by the Defendants, as a result of her engagement in protected activity.

283. Defendant's actions were taken under circumstances giving rise to an inference of retaliation.

284. The direct and proximate cause of Defendant's recklessness and negligence, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt her credit rating, lost career and business opportunities, suffered severe damage to her good name and reputation, and endured severe emotional pain and trauma, all to her detriment.

285. Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff in retaliation for Plaintiff's lawfully protected complaints.

286. Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of defendant Defendants Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to her personal and professional reputation in an amount to be determined at trial.

### .JURY TRIAL

287. Plaintiff demands a trial by jury of all issues in this action that are so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court:

a. Award compensatory damages for the back pay, front pay, pain, suffering, Award compensatory damages for the back pay, front pay, pain, suffering, emotional distress, loss of dignity, humiliation, and damages to reputation and livelihood endured by Plaintiff and all other damages afforded to Plaintiff by statute or otherwise in an amount to be determined at trial;

b. Award Plaintiff punitive damages in an amount to be determined at trial;

c. Award Plaintiff costs for this action and reasonably attorneys' fees, as provided for in 42 USC §1988 and 42 USC §2000e-5(k) and;

d. Award Plaintiff punitive damages in an amount to be determined at trial New York

City Human Rights Law Administrative Code §8-502(a);

e. Find Defendants strictly liable pursuant to New York City Human Rights Law Administrative Code §8-107(13)(b);

f. Award Plaintiff costs for this action and reasonably attorneys' fees, as provided for in New York City Human Rights Law Administrative Code §8-502 (f);

g. All defendants herein are joint and severally liable for the actions of the any and all of the named Defendants herein;

h. Grant Plaintiff such other and further relief as may be required in the interest of justice.

Dated: December 4, 2020

New York, NY

Respectfully submitted,

By:____/s/_____
        John Scola

Law Office of John A. Scola, PLLC
Attorneys for Plaintiff Therese
Garafalo
30 Broad Street Suite 1424
New York, New York 10004
(917) 423-1445
jscola@johnscolalaw.com